## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Baltimore (Northern) Division

**JENNIFER SNYDER**
**2925 Berwick Avenue**
**Parkville, Maryland 21234**

       **Plaintiff,**                    **CIVIL ACTION NO. _____**

    **v.**

**TROY PALMER**
**2521 Oakley Avenue**
**Baltimore, MD 21215**

    **And**

**STATE OF MARYLAND,**
**MARYLAND TRANSPORTATION AUTHORITY**
**(MDTA)**
**2310 Broening Highway**
**Suite 100**
**Baltimore, Maryland 21224**

    **Serve On: Anthony Brown, AG**
    **Saint Paul Plaza**
    **200 Saint Paul Place**
    **Baltimore, MD 21202**

    **Defendants.**

## <u>COMPLAINT</u>

COMES NOW, Plaintiff, Jennifer Snyder, by her attorneys, Patrick S. Preller, Esq.,

Preller Law Firm, and Patrick S. Cassidy, Cassidy Law, P.L.L.C., and brings this case against

Troy Palmer ("Palmer"), and the State of Maryland Transportation Authority, for claims of sexual

harassment, discrimination, denial of reasonable accommodation, retaliation, and intentional

infliction of emotional distress, pursuant to Title I of the Americans with Disabilities Act of 1990

("ADA"), 42 U.S.C. 12111, *et seq.*, Title V, Section 503 of the Act, 42 U.S.C. 12203, Title VII

of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*, the Maryland Human Rights Act (Md.

Code Ann. SG §20-601 *et seq.*), and the common-law of Maryland, and states as follows:

## JURISDICTION AND VENUE

1.      Plaintiff's federal claims under Title I of the Americans with Disabilities Act of

1990, 42 U.S.C. 12111, *et seq.*, Title V, Section 503 of the Act, 42 U.S.C. 12203, and Title VII of

the Civil Rights Act of 1964, 42 U.S.C. §2000e *et. seq.*, supports federal question jurisdiction of

this Court under 28 U.S.C. §1331.

2.      Plaintiff's claims under the law of the State of Maryland rely on substantially

similar facts as do the federal claims aforementioned, and accordingly fall under the jurisdiction

of this Court pursuant to 28 U.S.C. §1337.

3.      All events described hereunder occurred within this judicial District and venue

accordingly lies in this Court.

4.      The Maryland state law claims set forth herein are so related to and intertwined

with Plaintiff's claims under the federal law that they form a part of the same case and controversy.

Therefore, this Court has supplemental jurisdiction over the Maryland state law claims pursuant

to 28 U.S.C. §1367(a).

## PARTIES

5.      Plaintiff, Jennifer Snyder (hereinafter "Plaintiff" or "Ms. Snyder"), is a resident of

Maryland, residing at 2925 Berwick Avenue, Parkville, Maryland, 21234, who, prior to

Defendants' retaliation, had a successful career and bright future with the State of Maryland.

6.      Defendant, Troy Palmer (hereinafter "Defendant" or "Mr. Palmer"), is a resident of Maryland, residing at 2521 Oakley Avenue, Baltimore, Maryland, 21215. Upon information and belief, at all times relevant to the Complaint, Defendant Palmer was employed by Defendant State of Maryland Transportation Authority as acting Deputy Director for the Office of Environment, Safety, and Risk Management (OESRM) and the Control and Damage Recover Unit (ACDR). At all times relevant to the period after MDTA discretely re-hired Palmer as a contractor on or about December of 2022, Defendant Palmer was still an "employee" within the meaning of Sec. 20-601(c)(1) of the MHRA: "Employee" which meaning includes "an individual working as an independent contractor for an employer."

7.      Defendant, State of Maryland, Maryland Transportation Authority (hereinafter "Defendant" or "MDTA") is an agency of the State of Maryland located at 2310 Broening Highway, Suite 100, Baltimore, Maryland 21224.

8.      Upon information and belief, at the time of the sexual harassment and retaliation, Defendant Palmer was acting within the scope of his employment with Defendant MDTA; the sexual harassment and retaliation happened in furtherance of the business of MDTA; and was done incident to the performance of the duties entrusted to Defendant Palmer by Defendant MDTA who is therefore vicariously liable for said sexual harassment and retaliation under the doctrine of *Respondeat Superior.*

9.      At all times material to this action, Defendant was an employer within the meaning of Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. 12111, *et seq.*, Title V, Section 503 of the Act, 42 U.S.C. 12203, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*, as well as the Maryland Human Rights Act (Md. Code Ann. SG §20-601 *et seq.*) (MHRA).

10. At all times material to this action, Plaintiff was an "employee" and in the "employ" of Defendant within the meaning of Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. 12111, *et seq.*, Title V, Section 503 of the Act, 42 U.S.C. 12203, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*, as well as the Maryland Human Rights Act (Md. Code Ann. SG §20-601 *et seq.*).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES AND TIMELY FILING

11. In response to hostile conditions of sexual harassment at MDTA, failure to reasonably accommodate, sex discrimination, and retaliation against her by Defendants, Ms. Snyder filed a timely Charge of Discrimination with the Baltimore Field Office of the Maryland Commission on Civil Rights ("MCCR") on or about January 27, 2023, under EEOC Charge No.: 531-2022-02778. Plaintiff requested a Right to Sue from said Commission on August 16, 2023, which was subsequently forwarded to the U.S. Department of Justice, Civil Rights Division. On October 27, 2023, the Civil Rights Division provided Plaintiff with two Right to Sue Letters under Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. 12111, *et seq.*, Title V, Section 503 of the Act, 42 U.S.C. 12203, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*, against Defendants. Plaintiff has complied with all administrative conditions precedent to filing this action.

## FACTS COMMON TO ALL COUNTS

12. On or about March 25, 2020, Plaintiff Snyder entered into a business relationship and contract of employment with MDTA in the Office of Environment, Safety and Risk Management/ Asset Control Damage Recovery (OESRM/ACDR). Plaintiff's initial position within the OESRM/ACDR was Occupational Health and Safety Compliance Officer I. On or

around the fall of 2021, all employees with that position were upgraded to Occupational Health and Safety Compliance Officer III, with Plaintiff currently remaining at said position.

13.     Plaintiff accepted employment with MDTA with an understanding and expectation that her position would come with opportunities for tuition repayment and training provided by the MDTA so as to advance within the OESRM/ACDR.

14.     In her position, Plaintiff reported directly to Defendant Troy Palmer, Acting Deputy Director of OESRM/ACDR. Plaintiff's direct supervisor, Joshua Van Houten, due to health issues, was mostly out the office from the time of Plaintiff's employment through the spring of 2022. Thus, Palmer filled in for Van Houten.

14.     In approximately September 2020, Defendant Palmer asked to "mentor" Plaintiff in her safety career, by and on behalf of Defendants. Plaintiff understood Palmer's offer of mentoring as part of the in-house training that MDTA provided to employees and that said mentoring would help Plaintiff learn the OESRM/ACDR's work processes so as to help advance her career with the MDTA.

15.     After Plaintiff agreed to Palmer's offer, Palmer then used Plaintiff's agreement as a pretext to pursue his sexual desires rather than provide any professional mentoring.

16.     At first, Defendant Palmer's conversations with Plaintiff were friendly and included professional and some personal matters, but nothing about intimate matters.

17.     Starting in approximately January 2021, Defendant Palmer began to make comments regarding Plaintiff's appearance, her clothing, and her body shape. Plaintiff told Defendant Palmer she was uncomfortable and that he was being unprofessional and inappropriate; however, Defendant's behavior persisted.

18.     Subsequent to that date, Defendant Palmer insisted on mixing his "professional" mentoring with "personal" mentoring, all under the guise of how he could make her career successful, if she followed his counselling and recommendations.

19.     For approximately the next year of employment, Defendant Palmer often called Plaintiff into his office for hours at a time, or, alternatively, when Plaintiff was not in the office and working remotely, Palmer monopolized Plaintiff's time with lengthy phone conversations. Whether in person, or on the phone, Palmer's conversations with Plaintiff revolved around Palmer's personal life, such as his dating life (past and present) and his sexual history. Each time that Palmer brought up inappropriate personal issues in his life, Plaintiff told Palmer to stop mentioning and discussing those matters. Additionally, if Plaintiff tried to cut off conversations or get off the phone with Palmer, Palmer repeatedly told Plaintiff that he was her boss and she could not hang up on him and that she had to do what he said. In short, Plaintiff had to daily contend with a hostile work environment and continuous harassment.

20.     At the same time, Defendant refused to provide Plaintiff with professional training, such as projects to complete, despite her repeated requests to Palmer, MDTA's prior interview promises to reimburse Plaintiff's tuition, and her desire to learn all work processes at the OESRM/ACDR. For example, sometime in 2020, Palmer agreed that MDTA would pay for Plaintiff to obtain her Safety Certificate through the Council, but after Plaintiff completed the first of eight required classes, Palmer told Plaintiff that "MDTA does not have money for that so you can't take that class," meaning that Plaintiff could not take further classes. Due to the pandemic, MDTA had canceled their tuition repayment program, so Plaintiff had no other options for educational advancements.

21.     Despite Plaintiff's protests about Palmer's inappropriate acts, Palmer's comments escalated in their outrageousness and offensiveness. For instance, around Halloween 2021, Palmer, in front of two of Plaintiff's co-workers, told Plaintiff that she could "dress up" for him. Similarly, when Plaintiff became upset at Palmer's repeatedly sexualized comments about Plaintiff's appearance and body, Palmer called Plaintiff a "prude" and persisted in making inappropriate and offensive comments that explicitly conveyed his sexual attraction toward Plaintiff. Further, Palmer consistently dismissed Plaintiff's discomfort with laughter, showing no concern for Plaintiff's distress caused by comments he considered "funny."

22.     After more than a year of Palmer harassing Plaintiff, in early February 2022, Defendant Palmer called Plaintiff into his office and told her that he "caught feelings" for Plaintiff. Plaintiff was extremely upset and after Plaintiff again rebuffed his advances, Palmer adopted an angrier and mean attitude toward Plaintiff.

23.     Not wanting to jeopardize her employment and fearful of Palmer's position (seniority and managerial status) within the OESRM/ACDR, Plaintiff attempted to avoid Palmer as much as possible.

24.     Plaintiff then reported Palmer's behavior and hostile work environment to Mr. Van Houten who was still in and out of the office due to health issues, but who was around more than when Plaintiff first started work at the MDTA. Upon information and belief, Van Houten and Palmer are close friends. In response to Plaintiff's complaints about Palmer, her requests that Van Houten talk to Palmer, and that Plaintiff did not want to be around Palmer, Van Houten told Plaintiff that he would not get involved and that Plaintiff had to talk with Palmer and deal with the situation herself.

25.     On or around April 20, 2022, after the frustration and distress caused by Palmer's harassment, and Van Houten's refusal to get involved, became unbearable, Plaintiff worked up the courage to confront Palmer even though she was afraid she would be fired for confronting him. Plaintiff went to Palmer's office and told him how upset she was with his incessant harassment of her, that she did not want any contact with him unless it was strictly work-related, and that she preferred to go through Van Houten if a work matter involved Palmer.

26.     On or around May 23, 2022, an investigator with the MDTA Equal Employment Opportunity (EEO) program, Diana Moreno, interviewed Plaintiff concerning an anonymous complaint. Said complaint was separate and independent of Palmer's harassment of Plaintiff. But when the investigator asked Plaintiff whether she had seen Palmer flirting with female employees, Plaintiff, with great trepidation, told the investigator about Palmer's harassment of her, despite Plaintiff's fear that doing so would jeopardize her job and anger Palmer whom Plaintiff was intimidated by. Thereafter, the EEO initiated an investigation of Palmer based on Plaintiff's complaint.

27.     On or around June 5, 2022, Plaintiff's direct supervisor, Van Houten, not yet knowing that Plaintiff had complained to the EEO about Palmer, phoned Plaintiff to warn her about the EEO investigation of Palmer. Specifically, Van Houten told Plaintiff that he called her to coach her about how to answer the investigator's question so that Palmer would not get into any trouble. Additionally, Van Houten told Plaintiff that coaching Plaintiff may not help Palmer because Van Houten had learned that Palmer had already admitted to the truth of the complaints, whereas Van Houten advised Plaintiff that Palmer should have denied the allegations. In response to Van Houten's request, Plaintiff feigned being busy and did not respond to Van Houten's offer of coaching. However, Van Houten's call further upset and distressed Plaintiff as it demonstrated

Van Houten's (her supervisor's) allegiance with Palmer. More so, after Van Houten learned that Plaintiff had lodged the complaint against Palmer, Van Houten refused to speak to Plaintiff unless absolutely necessary for work reasons.

28.     Upon information and belief, on or about June 10, 2022, the EEO investigation of Palmer determined that there was probable cause for Plaintiff's complaint of sexual harassment and the EEO recommended discipline up to and including termination. Plaintiff, though, would not learn of this determination until some months later at the beginning of August 2022. Despite the finding of probable cause and recommendation of discipline the EEO continued with the investigation through June and July 2022, which not only exceeded the MDTA's policy of completing sexual harassment investigations within 30 days, but also amplified Plaintiff's distress caused by the harassment and the sense that nothing would be done about it.

29.     While the EEO investigation ultimately would not yield a different determination than what was found by June 10, 2022, the prolonging of the investigation allowed MDTA employees who supported Palmer to retaliate against her, which furthered the anxiety and distress Plaintiff suffered from the harassment and hostile work environment.

30.     For example, in later June 2022, Van Houten made comments at a staff meeting about receiving complaints regarding the committee that Plaintiff oversaw, but had not mentioned any complaints to Plaintiff. Nor, after the meeting when Plaintiff asked Van Houten about the alleged complaints, did Van Houten provide any specific information about the alleged complaints and only provided vague comments. Likewise, on June 28, 2022, Alisha Bennett, a MDTA employee and friend of Palmer, sent Plaintiff a text message of a video from the Oprah Winfrey show of a pastor advising Oprah that you should pray for those who have wronged you. When

Plaintiff filed a grievance against Bennet for sending her the video, the grievance was denied without explanation.

31.     During the prolonged investigation, upon information and belief, Palmer walked back from his initial admission of harassing Plaintiff and began telling the investigators that Plaintiff was flirting with him, which caused Plaintiff to be interviewed two more times by the investigators and added to Plaintiff's mental and emotional distress. Relatedly, Plaintiff learned during the investigation that prior to Plaintiff's reporting the sexual harassment, a manager (Lynn Fry) had confronted Palmer to determine if he and Plaintiff were having an affair, stating that it was inappropriate to call Plaintiff into his office so often, and that she was not supposed to report to him, Plaintiff was to report to her actual supervisor, Joshua Van Houten. Likewise, prior to the investigation, but after Fry confronted Palmer, Palmer told Plaintiff that he wanted to fire Fry because "he couldn't stand her," and upon information and belief, in December 2021, Palmer suspended Fry for 10 days due to Fry's confronting Palmer about being inappropriate with Plaintiff.

32.     In June 2022, due to the immense mental and emotional stress caused by the sexual harassment and ongoing investigation, Plaintiff began to see a therapist and a psychiatrist for anxiety and depression, with the psychiatrist prescribing medication for Plaintiff's anxiety and depression. Relatedly, Plaintiff used personal leave from the end of June to the first week of July to separate from the stressful work environment and unresolved investigation. Plaintiff filed a grievance against Human Resources manager Tonya Dorsey, a friend of Palmer's, over having to use her personal time rather than be granted administrative leave, which Plaintiff believed appropriate given the hostile work environment. Said grievance was denied.

33.     It was not until on or about August 1, 2022 the EEO issued a letter to Plaintiff about the results of the investigation of Palmer finding "there was sufficient information obtained to support your complaint as alleged, and a probable cause finding has been determined." Nonetheless, upon information and belief, no discipline was taken against Palmer, and he was permitted to telework during the course of the investigation. Upon information and belief, due to the poor handling of Plaintiff's complaint, the EEO investigator working on Plaintiff's complaint, Diana Moreno, left her position at MDTA.

34.     On or about August 2, 2022, due to her ongoing anxiety and depression, Plaintiff sent a doctor's note to her supervisor requesting ADA accommodations to work remotely. She received no response to her request, but her ADA manager, Ryan Coleman, called Plaintiff and told her that ADA accommodations are "only for physical disabilities and not mental disabilities" so that if Plaintiff filed a request, he would deny it. Plaintiff then filed a grievance in response on or about August 17, 2022.

35.     On or about the same day, August 17, 2022, while Plaintiff was on the phone in the parking lot at MDTA, she felt someone staring at her. She looked to see the Executive Director, Percy Dangerfield--who Plaintiff has never met, but knows he is a close friend of Palmer--standing outside his truck and staring at her intensely, tilting his head in what Plaintiff felt was an intimidation tactic.

36.     After submitting and then rescinding his retirement paperwork multiple times, Palmer announced his retirement on or around September 1, 2022, and was allowed to retire without consequence, with full benefits and without any mention of Plaintiff's sexual harassment complaint in his file. Upon information and belief, it is MDTA policy that when retirement paperwork is filed, no disciplinary action can be taken against that individual. Despite Palmer's

retirement from MDTA, Plaintiff's workplace only became increasingly more hostile with continuing retaliation to the present.

37.     As a result of Palmer's retirement, Director Paul Truntich, who was away on special assignment, was forced to return to Palmer's position. Upon information and belief, up to the present, Mr. Truntich has maintained a friendly relationship with Palmer. During his first two weeks back, Mr. Truntich refused to acknowledge Plaintiff, and for subsequent months, he remained solemn and barely spoke to Plaintiff, retaliating against her for her complaint.

38.     In addition to MDTA's denial of reasonable accommodation, Plaintiff was denied administrative leave to cope with the mental health consequences caused by the harassment, which forced her to use up all of her personal time and take an unpaid leave from on or about October 11, 2022 to November 8, 2022. During this time, upon information and belief, Executive Director Percy Dangerfield made a concerted effort with his management team to deny Plaintiff any relief, with Plaintiff viewing said denials as further retaliation for reporting Palmer.

39.     In late 2022, due to her ongoing anxiety and depression, Plaintiff again requested from Mr. Coleman that she be able to work remotely as a reasonable accommodation to avoid the source of her anxiety and depression (i.e. her workplace) but was again denied such accommodation, which Plaintiff viewed as continuing retaliation. Despite the MDTA policy to give an ADA accommodations decision within 30 days, Plaintiff did not receive a denial letter from Mr. Coleman until January 2023.

40.     Upon information and belief, about three months after his retirement, the MDTA discretely re-hired Palmer as a contractor, and he continues to contract with the MDTA, working in connection with Plaintiff's direct superiors, such as Mr. Truntich.

41.     In addition to Mr. Truntich's refusal to speak to Plaintiff for months, throughout early 2023 and continuing to present, Plaintiff has endured verbal altercations, unnecessary conflicts, and general discomfort at the hands of Mr. Truntich. For example, in April 2023, MDTA hosted a "shore clean-up" in which Plaintiff and Mr. Truntich worked together to set up, but when Plaintiff, the safety officer, challenged Mr. Truntich's decision to place a table on wet grass, he loudly and condescendingly berated Plaintiff in front of all coworkers present. Later, in a meeting with Plaintiff and other coworkers in May 2023, Mr. Truntich reiterated his displeasure with returning to Palmer's role.

42.     In August 2023, Josh Van Houten was replaced by a new Chief, Terricka Holman Moore, who has been supportive of Plaintiff. Upon information and belief, shortly after beginning her position, Mr. Truntich had a Teams video meeting with Ms. Moore and Palmer to clarify the secrecy of his continued contracting.

43.     A few weeks later in October 2023, Plaintiff attended a Teams video meeting with Mr. Truntich, Ms. Moore, and coworkers, in which Plaintiff was given an assignment. When Plaintiff asked Ms. Moore to clarify which sources could be used, as Palmer had vetted sources previously, Mr. Truntich interjected himself into the conversation and questioned Plaintiff as to "why" she was asking. Plaintiff stated that previous management did not allow it, to which Mr. Truntich responded, "what are you talking about," and continued to interrogate Plaintiff until she was forced to say it was Palmer. Mr. Truntich then stated "we don't need to bring that up," and sternly reiterated "that's the past, we need to move on."

44.     Into November 2023, Mr. Truntich, friend of Palmer, continued his refusal to work with Plaintiff, often side-stepping her authority and communicating with other coworkers on matters that were Plaintiff's sole responsibility. For instance, to get more information regarding

one of Plaintiff's programs, Mr. Truntich emailed a coworker not working on the program, Scott Malott, instead of asking Plaintiff directly.

45.    Through the end of 2023, Plaintiff endured similar challenges to performing her work and felt increased pressure from the MDTA and friends of Palmer to terminate her employment.

46.    In contrast to the kid glove treatment afforded Palmer by the MDTA, Plaintiff suffered (and continues to suffer) emotional distress, anxiety, and depression caused by Palmer's sexual harassment, the retaliation by Defendants for Plaintiff's reporting the harassment, and the unnecessarily prolonged investigation that provided no remedy for Plaintiff and only added to her suffering.

47.    Likewise, while Palmer was allowed to retire unscathed, Plaintiff's career with the OESRM/ACDR languished due to Palmer's refusal to provide her with training or assignments so that he could monopolize her time, and Plaintiff has not had any career progression. For example, two of Plaintiff's co-workers who were hired after Plaintiff received training on job processes that Plaintiff did not receive and were able to apply for promotions within the OESRM/ACDR; whereas, despite her seniority, Plaintiff did not feel adequately prepared because of her lack of training and the continuing retaliation from Mr. Truntich.

48.    Plaintiff has attempted to mitigate her career stagnation by pursuing her safety degree through MDTA's tuition repayment program that resumed post-pandemic, which, to present, remains her sole reason for maintaining employment in such a hostile work environment and enduring Defendants continuing retaliation.

49.    As a direct and proximate result of Defendants' actions, Plaintiff was caused to suffer embarrassment, fear, mental anguish, and severe and ongoing anxiety disorder and major depressive disorder, which require daily medications.

## COUNT I
### Claims against All Defendants for Sexual Harassment and Retaliation,
### Arising Under Title VII of the Civil Rights Act of 1964

50.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 49 as if fully set out herein.

51.    This action is brought against Defendants for violation of 42 U.S.C.A. §2000e-2.

52.    Plaintiff is a member of the protected class under said statute, female, and filed timely charges with the EEOC, and all administrative conditions precedent to the filing of this action have been met.

53.    On October 27, 2023, the EEOC issued its Notice of Right to Sue on said administrative claim, which Notice is attached hereto and incorporated by reference herein as **Exhibit 1**.

54.    This Court has concurrent jurisdiction with the appropriate federal court to adjudicate Plaintiff's Title VII claim.

55.    The acts of sexual harassment and retaliation as alleged in Plaintiff 's charge with the EEOC, including, Palmer's sexual harassment, Van Houten's refusal to confront Palmer about the harassment after Plaintiff reported the harassment to Van Houten, Plaintiff's stunted career with the MDTA, and Defendants' denial of Plaintiff's request for leave, establish a prima facie claim under Title VII of the Civil Rights Act in that said actions constituted verbal or physical conduct based on Plaintiff 's gender, female; the conduct was unwelcome; and the conduct was

sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment; under circumstances forming a basis for liability on the part of Defendants.

56.     As a result of Defendants' sexual harassment, maintenance of a hostile work environment based on her gender, female, and retaliation, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and inconvenience; she began to suffer (and continues to suffer) from major depression and anxiety which has caused her economic loss and potential to date and will continue to cause her economic loss and potential into the future, by impeding her ability to engage in, and advance in, the profession of her choice; and all of which conduct has caused substantial impairment of her professional and personal reputation, and loss of personal dignity; all in an amount as yet unascertained, but in excess of minimum jurisdiction of the Court.


## COUNT II
### Claims against All Defendants for Harassment, Sexual Harassment and Retaliation, Arising Under the Maryland Human Rights Act (MHRA)

57.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 56 as if fully set out herein.

58.     This action is brought against Defendants for violation of Md. Code Ann. SG §20-601 *et seq*., including but not limited to Sec. §20-611, of the MHRA.

> Sec. 20-611: In an action alleging a violation of this Subtitle based on Harassment, an Employer is liable:
> (1)  For the acts or omissions toward an Employee or applicant for employment, committed by an Individual who:
>> (I)       undertakes or recommends tangible employment actions affecting the employee or an applicant for employment, including hiring, firing, promoting, demoting, and reassigning the employee or an applicant for employment; or
>> (II)       directs, supervises, or evaluates the work activities of the Employee; or
> (2)  If the negligence of the Employer led to the Harassment or continuation of Harassment.

59.     Defendants constitute an "employer" under said statute, Plaintiff constitutes an "employee" under said statute, and Plaintiff is a member of the protected class under said statute, female, and filed timely charges with the EEOC, and all administrative conditions precedent to the filing of this action have been met.

60.     On October 27, 2023, the EEOC issued its Notice of Right to Sue on said administrative claim, which Notice is attached hereto and incorporated by reference herein as **Exhibit 1**.

61.     This Court has supplemental jurisdiction over Plaintiff's MHRA claim pursuant to 28 U.S.C. §1367(a).

62.     The acts of harassment, sexual harassment and retaliation as alleged in Plaintiff 's charge with the EEOC, including, Palmer's sexual harassment, Van Houten's refusal to confront Palmer about the harassment, and Plaintiff's stunted career with the MDTA, establish a prima facie claim of harassment, sexual harassment and retaliation under the MHRA in that said actions constituted verbal or physical conduct based on Plaintiff 's gender, female; the conduct was unwelcome; and the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment; under circumstances forming a basis for liability on the part of Defendants.

63.     As a result of Defendants' harassment, sexual harassment, maintenance of a hostile work environment based on her gender, female, and retaliation, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and inconvenience; she began to suffer (and continues to suffer) from major depression and anxiety which has caused her economic loss and potential to date and will continue to cause her economic loss and potential into the future, by impeding her ability to engage in, and advance in, the profession of her choice; and all of which

conduct has caused substantial impairment of her professional and personal reputation, and loss of personal dignity; all in an amount as yet unascertained, but in excess of minimum jurisdiction of the Court.

**COUNT III**

**Failure to Accommodate under the American's with Disabilities Act ("ADA")**

64.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 63 as if fully set out herein.

65.     This action is brought against Defendants for violation of 42 U.S.C.A. § 12112(b)(5)(A).

66.     Plaintiff is a member of the protected class under said statute and filed timely charges with the EEOC, and all administrative conditions precedent to the filing of this action have been met.

67.     On October 27, 2023, the EEOC issued its Notice of Right to Sue on said administrative claim, which Notice is attached hereto and incorporated by reference herein as **Exhibit 2**.

68.     This Court has concurrent jurisdiction with the appropriate federal court to adjudicate Plaintiff's ADA claim.

69.     As alleged, at all times material to this action, Defendant was an employer within the meaning of Title I of the Americans with Disabilities Act ("ADA") of 1990, 42 U.S.C. 12111, et seq.

70.     Plaintiff, who suffered (and continues) to suffer from major depression and anxiety, caused by Defendants' harassment, sexual harassment and retaliation, qualifies as an individual with a disability within the meaning of that term under the ADA.

71.     Plaintiff is a qualified individual with the position of Occupational Health and Safety Compliance Officer III who could perform the essential functions of said position.

72.     In early August 2022, Plaintiff, due to the aforementioned major depression and anxiety caused by Defendants, first requested the reasonable accommodation of teleworking 5 days a week so as to avoid a hostile workplace. Plaintiff's request to Defendants was timely supplemented by a doctor's note attesting to Plaintiff's need for said accommodation. Upon information and belief, not long after Plaintiff first submitted her request, Ryan Coleman, Manager of the MDTA EEO Office and ADA Coordinator, told Plaintiff that ADA accommodations are only for physical disabilities and not mental disabilities

73.     On or about January 17, 2023, Ryan Coleman, unreasonably denied Plaintiff's request and Defendant MDTA failed to provide the requested accommodation.

74.     As a result of Defendants' failure to accommodate, Plaintiff has used her personal time and leave to compensate for the lack of accommodation, and has also taken un-paid sick leave to compensate for the lack of accommodation; Plaintiff  suffered severe emotional distress, embarrassment, humiliation, and inconvenience;  she began to suffer (and continues to suffer) from major depression and anxiety which has caused her economic loss and potential to date and will continue to cause her economic loss and potential into the future, by impeding her ability to engage in, and advance in, the profession of her choice; and all of which conduct has caused substantial impairment of her professional and personal reputation, and loss of personal dignity; all in an amount as yet unascertained, but in excess of minimum jurisdiction of the Court.


**COUNT IV**
**Intentional Infliction of Emotional Distress**

75.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 74 as if fully set out herein.

76.     Defendant Palmer's conduct in continually sexually harassing Plaintiff despite Plaintiff's obvious rejection of Palmer's advances and Plaintiff being clearly upset by the harassment, combined with Plaintiff's supervisor's, Van Houten's, refusal to confront his friend Palmer about the harassment despite Plaintiff informing Van Houten of how upset she was by the continuing harassment, was intentional, reckless, extreme and outrageous.

77.     Defendants' conduct was intentional, reckless, and in deliberate disregard of a high degree of probability that emotional distress would result to the Plaintiff.

78.     Defendants' conduct was malicious, willful and beyond the bounds of decency in society.

79.     There is a causal connection between Defendant Palmer's actions and the severe emotional distress caused to Plaintiff by virtue of the Defendants' conduct.

80.     As a direct and proximate result of Defendants' conduct, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and inconvenience; she began to suffer (and continues to suffer) from major depression and anxiety which has caused her economic loss and potential to date and will continue to cause her economic loss and potential into the future, by impeding her ability to engage in, and advance in, the profession of her choice; and all of which conduct has caused substantial impairment of her professional and personal reputation, and loss of personal dignity; all in an amount as yet unascertained, but in excess of minimum jurisdiction of the Court.

### COUNT V
### Negligent Retention and Supervision (MDTA)

81.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 80 as if fully set out herein.

82.     Upon information and belief Defendant MDTA hired and/or employed Defendant Palmer, Van Houten and Coleman on or before March 25, 2020.

83.     Defendant MDTA had a duty to use reasonable care in supervising and retaining Defendant Palmer, Van Houten and Coleman.

84.     Defendant MDTA had actual knowledge of, knew or should have known that Defendant Palmer, Van Houten and Coleman's conduct violation Maryland law, Federal law and MDTA's own policies and that Defendant Palmer, Van Houten and Coleman were not competent or fit for the duties for which they were hired.

85.     A reasonable and prudent employer would not have ignored such indications of Defendant Palmer, Van Houten and Coleman's unfitness for such duties.

86.     Defendant MDTA breached its duty of due care, violated the standard of care, was negligent and grossly negligent, and breached duty to Plaintiff, including, but not limited to, the following: in allowing Defendant Palmer's conduct in continually sexually harassing Plaintiff despite Plaintiff's obvious rejection of Palmer's advances and Plaintiff being clearly upset by the harassment, combined with Plaintiff's supervisor's, Van Houten's, refusal to confront his friend Palmer about the harassment despite Plaintiff informing Van Houten of how upset she was; allowing Coleman to unreasonably deny Plaintiff's request and Defendant MDTA failed to provide the requested accommodation; permitting Van Houten's refusal to confront Palmer about the harassment; permitting Defendant Palmer, Van Houten and Coleman's to stunt Plaintiff's career with the MDTA; by negligently hiring, supervising and/or retaining Defendant Palmer, Van Houten and Coleman; by otherwise failing to supervise its employees Palmer, Van Houten and

Coleman with respect to their treatment of Plaintiff as outlined above; by failing to timely and reasonably investigate the Plaintiff's complaints when it had, or should have had, sufficient reason to investigate such changes; and by allowing Palmer, Van Houten and Coleman and other MDTA employees to fail to timely notify Plaintiff of the results of MDTA's investigation.

87.    Defendant MDTA knew, or should have known, of Defendant Palmer, Van Houten and Coleman's conduct as outlined above.

88.    Plaintiff is an employee who would foreseeably be supervised by—and/or be forced to interact with—Defendant Palmer, Van Houten and Coleman.

89.    As a result of Defendant MDTA's negligence in retaining and supervising Defendant Palmer, Van Houten and Coleman, As a direct and proximate result of Defendants' conduct, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and inconvenience; she began to suffer (and continues to suffer) from major depression and anxiety which has caused her economic loss and potential to date and will continue to cause her economic loss and potential into the future, by impeding her ability to engage in, and advance in, the profession of her choice; and all of which conduct has caused substantial impairment of her professional and personal reputation, and loss of personal dignity; all in an amount as yet unascertained, but in excess of minimum jurisdiction of the Court.

90.    As a result of all Defendants' unconstitutional actions, Plaintiff has suffered economic loss in the past, and will continue to suffer economic loss in the future; has suffered inconvenience, humiliation, loss of professional reputation and esteem; all in an amount as yet unascertained, but in excess of minimum jurisdiction of the court.

WHEREFORE, Plaintiff Jennifer Snyder requests that this Court grant judgment in her favor jointly and severally against the Defendants in the amount as determined by a jury in excess

of Seventy-Five Thousand Dollars ($75,000.00) in compensatory and punitive damages, interest, costs and fees including reasonable attorneys' fees, and hereby incorporates paragraph 90 above herein.

Date: December 30, 2023

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby demands a jury trial.

Respectfully submitted,

JENNIFER SNYDER, Plaintiff


By:_____/s/_____
 Patrick S. Preller, Esq. (9812170058)
 PRELLER LAW FIRM, LLC
 16 S. Frederick Street
 Baltimore, Maryland 21202
 Phone (410) 539-0042
 Fax (410) 539-2955
 ppreller@prellerlawfirm.com

 and


 _____/s/_____
 Patrick S. Cassidy, Esq.
 (MD Bar No. 2004270007)
 CASSIDY LAW, PLLC
 The First State Capitol
 1413 Eoff Street
 Wheeling, West Virginia  26003-3582
 Telephone: (304) 232-8100
 Fax: (304) 232-8200
 pcassidy@walslaw.com

{00201799.1}